You know, I'd like to start. Let me just check in. Judge Greenberg, are you okay there? Can you hear us? I'm fine. All right. I'd like to start by saying my clients are not parasites, and this is not a parasitic FCA lawsuit. And I think that's the conclusion that this court should reach on the public disclosure issue. I have a few issues to discuss with the court in our short amount of time and would like to lay those out so that then we can discuss them and answer any questions that the court has. First, the district court's materiality ruling was in error and its judgment on that issue should be reversed. Because of Escobar. Because of Escobar. Under the standard enunciated by the US Supreme Court in Escobar, the claims in this case clearly are material. The district court did not analyze Escobar. The district court should have found that these claims are material under Escobar, and that should be the result that we get today. Secondly, the district court's news media, from the news media ruling, also was in error. It's totally irreconcilable with Congress's 2010 amendments to the False Claims Act. In 2010, Congress removed state and local administrative reports from the list of qualifying sources for a public disclosure. Prior to that, they were on the list. They were included. The district court's ruling has the effect of fully undermining Congress's amendment to that act in 2010, because as long as the state and local report is published on the state's or the locality's website, this court's ruling says, well, it transforms into news media, and therefore, again, becomes a qualifying public source. Does the word news media appear in the statute? Yes, Your Honor. The statute says from the news media. From the news media. From the news media. So if we get it from the news media, then you can't cash in, if I can use the expression. The statute says, if the same allegations or transactions that are alleged in the case were publicly disclosed from the news media, then... Okay, so your argument is simple, that the publication that they made on the internet is simply not a news media. That's part of it, Your Honor. Interpreting what Congress meant by that phrase, from the news media. The courts have been very clear, and this court has been very clear, about statutes of canon, statutory interpretation, canons of statutory interpretation, to figure out what they mean. Doesn't Schindler-Elevator, 2011 Supreme Court case, say that the words in the public disclosure bar to be given a broad sweep? Absolutely, yes, Your Honor. What does that mean, if anything, as to this question? Your Honor, it hasn't been fleshed out in the courts to a broad degree, but this is the point that I would make on that. From the news media certainly is broad. It includes television, radio, internet news publications, journalists, periodicals, scientific periodicals. It includes all of those kinds of things, and entities and people who are in the business of gathering information, analyzing or synthesizing it, maybe editorializing it, and then publishing it for consumption by the public as news. And that is extremely broad. It is very broad, but it is not limitless. Okay, but from the changes in 2010, although they took out state and local and excluded state and local sources, the 2010 amendments does not change the wording on the news media. No, sir, it did not. Okay. Are you familiar with a case, USXREL-REPCO versus Guthrie Clinic, a non-precedential opinion I will grant you from our court in 2012, which said that a website could be news media? Can be news media and is news media are two different. And was in that case? It was in that case, and it could be in a case given the facts of a case. But under the facts of this case, it is not. You know, the city's Department of Planning published its own administrative report without editorializing, without describing. Why wouldn't it be when through the city website that information becomes public? Because, Your Honor, the standard is not whether there has been a public disclosure. The standard is whether there has been a public disclosure in a qualifying source. And state and local reports are not a qualifying source after 2010. So is there a distinction to be made between pre-ACA and post-ACA in terms of original source? Yes, Your Honor, there is a distinction. Do the relators qualify as original sources both pre and post-ACA? Yes, Your Honor, I believe that they do. Pre-2010, the FCA original source exception applied when the relator had both direct and independent knowledge of allegations and transactions that show fraud or false statements or false claims. And that's for the public expenditures, the block grants, and the community grants. Is that right? Is there a distinction between three buckets of money, I'll say? Can you elaborate on that question? I didn't follow. Yeah, there are three buckets, as it were, as I understand it, right? There's the CDBG Fund. It's a federal grant program. The... The Home Fund. The Home Fund. Yes, which is another similar related federal grant program. Is there a third bucket of money as well? Well, the only third bucket is income that's generated from those two programs. The income that the city or its agencies generate from investing that money also has to go back and follow the citizen participation process. It also has to go back and satisfy the Affirmative Referring Fair Housing Certifications. But those are the funding sources that are at play, for sure. So your relators that you represent would qualify as original sources under both pre- and post-act? Yes, Your Honor. Under the pre-act, the relators had direct knowledge of the allegations that they have raised, and their knowledge is independent from what is ascertainable in the public disclosure sources that the city has identified. Pre... May I finish answering that question, Your Honor? Excuse me. Pre-2010, local administrative reports could qualify as a qualifying source for a public disclosure. But then the question is, are the allegations and transactions, or the allegation of fraud, or all of the transactions necessary to infer fraud, are they in those reports? And the relators say, no, they're not. They've alleged numerous things that cannot be ascertained from those reports. Now the city says, oh, yes, they can, but the city has never identified where in those reports the allegations appear, or where in those reports the transactions that support the allegations appear. And in the briefing to this Court, Your Honor, we have laid out numerous allegations of false claims that are not in the reports, cannot be ascertained from the reports. All right. Now, the big question, though, I think, with what you've laid out, is materiality. And it does change the landscape, Your Honor. How does it help you? It does help us. Your Honor, the Escobar Court started with the statute. The statute in 2010, excuse me, the statute in the FERA amendments in 29 enunciated, articulated, made explicit what the materiality standard was going to be. The FERA amendments. This Court recognized this in the CBS versus Spey case, and had a good analysis about this. Prior to 29, the federal courts had been here and there about what materiality meant. Some were more harsh, some were more lenient. Congress recognized that and stated its materiality standard right in the statute, and Escobar recognizes that. You know, the term material means having a natural tendency to influence, or capable of influencing the payment of money. That's what it means. And the Court went on to look at the other provisions of the FCA, which don't have that different materiality standard, and found that, no, there shouldn't. In the common law under fraud, those cases, the materiality element in those cases is similar. You know, having a natural tendency to influence. And the Escobar Court resolved, essentially, that there are two ways, a false claim or a legal requirement that is being said as being complied with, but falsely so. There are two ways that that is material. If a reasonable person would attach important, importance to it in determining his course of action, or if the defendant knew or had reason to know that the recipient of the representation, in fact, attaches importance to it. In our case, the city has reason to know that HUD considers these three certifications important. They have reason to know because they're spelled out in the statute as mandatory conditions of payment. HUD tells the city, you must certify your compliance with these three conditions to us every year. Of course, the city knows that HUD takes that important. Escobar said an explicit condition of payment may not, in and of itself, always trigger liability, because any one scenario, you know, by itself isn't enough. Materiality is a standard to be evaluated. But under the standard, the court spelled out a number of factors in determining materiality. One was whether it is an express condition of payment. May not be, per se, determinative, but it certainly is relevant. Right? Another is whether it is a minor or insubstantial requirement. You know, the requirement that the city be open and express to the public how it's going to spend money, and be open and express to the public how it has spent money. Those are critical requirements of this program. Those are not insignificant. Those are not minor. You know, the requirement that the city do that is spelled out in the statute, and Congress was explicit about that one, and spelled out what those requirements were in the statute, allowed HUD to flesh it out, but there's not even this to the satisfaction of the secretary language on that one. That can't be considered minor or insubstantial, and neither could the fair housing certifications, nor could the ineligible activity certifications. You know, the cities are allowed to spend these pots of money on lots and lots of things. The city says my clients want to put a stranglehold on them and dictate how this money gets spent. That's not it. My clients are concerned that the city spends vast sums doing regular responsibilities that are explicitly ineligible for this money, and the problem with that is then those vast sums aren't available for eligible activities in their communities. You know, if the city's patching potholes and sidewalks, and maintaining vacant lots and properties, and painting their community buildings, and doing other maintenance and repair, or buying equipment, those millions and millions of dollars are not available to do eligible activities in the communities where my clients constituents live. That's their issue with that. You know, they can't even approach the city through a citizen participation process to make it known and argue those points, because the information isn't provided enough in the reports to let them know in advance how the money will be spent, if you look at the reports available to the public for comment, and compare those to what gets submitted to HUD, every year there are vast differences. The city leaves huge blanks in what the public can comment on that they then fill in in what they submit to HUD. The city will say, well, that's because we take the comments and then fill in blanks. No, you have to let the public know how you intend to spend it, give them the ability to comment, and if you look at the changes between what the public saw and what was submitted to HUD, it's never related just to comments that the public put in. Part of the question here on materiality, I think, may go to what you're arguing here, and it works against you. If what you say is correct, HUD's not done anything administratively to force the city to change the way they report. Your Honor, you're assuming, like the city has argued, that there is evidence that HUD has actual knowledge of the truth of the allegations in this case, and there is no evidence in the record to support that. The court dismissed this case on a 12b-1 and 12b-6 pre-answer motion. The standard the court should have applied to both of those was just from the face of the complaint, which does include things the court can take judicial notice of. You know, is it manifest that relators can't state a claim? Are they doing it in a frivolous way or just to invoke the jurisdiction of the court? Or, you know, is it manifest that they can't produce discovery that will, you know, prove their claims? The answer is no. I mean, we should have gone beyond this issue. You know, whether the US Supreme Court said whether an issue is material, you know, goes to whether it has the tendency to influence the payment decision. The requirements in this case that the city certifies that it complies with, each of them goes to the core of what the US is bargaining for here, and the US attorney will speak to that further. So, at the end of the day, is your position that had HUD known the truth, they wouldn't have paid? Of course, we allege that in the complaint. That had HUD known that they're being lied to on these certifications, they wouldn't make these payments. We allege that right in the complaint. Judge Greenberg, any questions? No, I don't have any questions. Good afternoon, Your Honors. John Hansberry, representing the Appalese, the City of Pittsburgh, and former Mayor Lou Gravenstahl. Your Honors, I'd like to touch on four points, which I think are critical to the FCA analysis here, and I'd like to pick up... Where's Amicus Counsel? There we go, okay. Here and accounted for, Your Honor. I'd like to touch on four points that I think are critical to the FCA analysis, and I'd like to pick up with what the court was just discussing, which was materiality. Obviously, materiality has been a touchstone of FCA litigants in recent years. The district court analyzed materiality under this court's analysis under Wilkins, and in that case, the court, the district court, gave a very short summary of the materiality analysis and said that under an implied certification theory, which is what we have here, the plaintiff must show that if the government had been aware of the defendant's laws and regulations that are the basis of a plaintiff's FCA claims, it would not have paid the defendant's claims. That's the Wilkins analysis. The court here can very quickly dispose of the entire Wilkins analysis by looking at the 121 paragraph amended complaint, and very quickly realize that there are no allegations of the government's conduct in that complaint whatsoever. The analysis does not change under Escobar. Escobar, as this court noticed in Petrados and accepted the reasoning in Escobar, has a heightened materiality standard, and under Petrados, the court asks two basic questions. One, materiality may be found where the government consistently refuses to pay claims in the mine run of cases based on a non-compliance with the particular statutory, regulatory, or contractual requirements. That factor is not addressed anywhere in this complaint. Two, on the other hand, it is very strong evidence that a requirement is not material if the government pays a particular claim in full, despite its actual knowledge that certain requirements were violated. Your Honors, here we have a situation where at least, or no later than the funding stream here has continued uninterrupted in full in 2012, 13, 14, 15, 16, and 17. Through 2016, that includes the claims period here. The allegation of the complaint is an ongoing violation. Under Escobar, we would look at the mine run of cases and ask, in any of these cases, has HUD refused payment? And there is no allegation of the complaint, and there's no evidence. Of such a situation, and in this case in particular, has HUD made any demand to have money back? And the answer is no. Since that's not it, that's obviously not in the record. This was 12B, 6, dismissal. Now, how do we evaluate that? Your Honor, I do believe it is in the record. I believe that we have put that in the record, and I could, I'd have to pull the exact appendix site, but we did raise that exact issue, and it is not disputed on motion. You raised that before the district court? We did. Okay, and okay, that was the, all right, those are the additional documents that the court evaluated. It's part of it, correct. Okay. So, so the, so what we did, Your Honor, is we have submitted. How did you, how did you submit that in the form of a negative? How did you prove a negative? Your Honor, obviously the district court can take judicial notice of certain documents, and so moving to my second, not, you know, not making claims seems to me as a negative. How would the district court have that information? The court can very easily take notice of the fact that over the entire claims period, and again, this complaint, the complaint was initially filed under seal in 2012, right, and funding continued, and the motions to dismiss were not fully briefed until 2015, I believe. During that entire period, the city did what any entitlement community would do. It prepared annual action plans. It prepared annual KPERS, consolidated activity reports. It consolidated, it prepared five-year plans, and it in, it prepared five-year analysis of impediment reports, all of which the court could and did take judicial notice of, all of which included some of the issue here, all of which are evidence that the continuing funding stream was never interrupted. It's a fact that's not challenged in this lawsuit. Which brings me to my second, the second piece of my comments today. Beyond the Escobar analysis, which I believe is dispositive of all claims, the court, the district court did not spend much time on materiality analysis for the simple reason that there are no allegations in the complaint about the government's conduct. What the, what the district court did spend a lot of time on was the statutory and regulatory framework, which here I think is clear evidence of what the court described as a condition of participation rather than a condition of payment, and although those terms have changed and have been overhauled post-Escobar, I think the analysis is identical, and what the court found there was that in this framework we have a very different kind of animal than what we see in a typical FCA case. This is not a student loan case or a medical reimbursement case. This is a federal entitlement grant, and the way it works is very simple. Congress, by statute, sets aside certain money for entitlement communities like the city of Pittsburgh, and it's set by a statutory formula, and it has a number of factors which include census data and, quite frankly, the federal budget. It's a moving target, but the city and entitlement communities have no input into whether they receive it or how much that amount is. They just receive that money, and in order to do that, what they do is they prepare an annual action plan. Every year they do this. It's a month's long process. A process includes an initial draft, which the city prepares and then sends to HUD for review and approval, and it puts out for public consumption. One of the issues we will touch on, I will touch on in just a moment, is public disclosure. The city makes these plans available by posting them on the website, by making hard copies available at the city, and by going out four times a year and having public meetings at which public input can be taken from the citizens. After that process is completed and HUD has given its input, after that is approved, that is when these certifications come into play, and the certifications say what the city plans to do, what the city hopes to do with these funds, and then the CAPER, which comes at the end of the year, reports on what was done. This happens every year. HUD is intimately involved with that spending and approval process. That's on the macro level on a yearly basis. As we've articulated in our briefs, there's also a five-year plan in which the city takes a broader view on how they're going to spend money and address different issues of blight and slums in our cities, and takes a five-year plan of what they call analysis of impediments to fair housing. It's a very comprehensive process in which HUD is intimately involved. All of these things make this very different than a reimbursement for a medical expense. HUD knows from the get-go what the plan is, and HUD understands that these are fluid processes. The key here is that HUD's taking the city's word for it, right? We're spending the money in the appropriate fashion. No. They are not taking the city's word for it because they are intimately involved on a daily basis with the expenditures. The court will read in the briefs. So you say they, who's they? I'm sorry, HUD. HUD knows on a daily basis what the expenditures are. So these CDBG and home funds, there are actually three buckets. Council referred to CDBG, Community Development Block Grant, and home funds. The third bucket is actually something called ESG. It's a third type of funding. That's what these certifications relate to. When the city or any entitlement community spends these monies, what they do is they go into an electronic system called IDIS, and they go to a credit account with HUD, and they draw that money down for reimbursement. Those reimbursements go to contractors that do all kinds of projects throughout the city. Those projects can range from hundreds of dollars to tens of thousands of dollars, and HUD has access to and approves every one of those transactions. So it's not just taking the city on its word. It is an ongoing relationship. HUD also audits on an annual basis. They don't audit the entire spending program, but they audit select pieces of the program. So this is different than a strict reimbursement type of plan. This is an entitlement grant where both sides are intimately involved, both at field office level, HUD field office, HUD FHEO, and national, are reviewing these policies and plans. But I think if I understand the relator's position, is that the funds are being inappropriately spent. Right, so that's the ineligible. There are two components to this. One is the ineligible expense claim, and if I may, I'll bridge into the public disclosure bar with that piece. So the ineligible expense claim was essentially, there are quote-unquote ordinary activities of government that you cannot spend money on, which we all admit are true. There are also tens and hundreds and thousands of activities, which could be very eligible depending on what they're used for. I'll give you a great example. The city uses money for street repaving. It can use CDBG dollars in certain instances depending on where they're repaving. If it is in a blighted community, that might be an acceptable, eligible use of CDBG funds. If they use the same money in an area that's more upscale, that's not blighted, those are not eligible. If you use monies to make curb cuts, that money is eligible. If you use the money to build a parking garage, where the parking garage will give dollars to investment and jobs to low-income and minority people, that can be CDBG eligible, and HUD reviews and approves those on a regular basis. So the argument is that these were not eligible expenses, and part of the response to that is, no, that is left to the discretion of HUD, and the statute is very clear that in a dissatisfaction of the Secretary, compliance is determined by the Secretary. And your honor, the reason for that is very simple. There are at least nine national objectives that we try to reach on an annual basis with CDBG funds. They're vast and enormous. The problems that we're trying to address are just as vast and enormous, and the key to these programs, the touchstone of these programs, is flexibility. And so what Congress recognized in HUD and ACTS is a system by which they watch the spending on an annual basis, and they respond to it. And HUD has all kinds of enforcement letters. What typically happens is if they feel that funds are not spent properly, they can issue a letter of warning, a letter of non-compliance, which is followed up by a response from the city, and the two sides will try to negotiate and work out what the issue is, and one of two things can happen. One, the city can reprogram funds going forward. For example, if it spent a thousand dollars on a project which HUD later deemed to be not eligible, HUD will say you could not have used those monies there. HUD does not ask for the money back. By the regs, what they ask is that money be reprogrammed in a future year. It's a future remedy, and that's critical for the FCA analysis, and it's critical for... What relief, Judge Greenberg, are you ultimately seeking in this case? In this case, Your Honor, we are looking for an affirmance of the district court's decision. The district court dismissed this on a motion to dismiss under 12b-1 and 12b-6, and we would be asking that the court affirm that decision. I have just two minutes left. Post-2010, this question of news media was raised by your opposition. I understand your... I understand the question, but I'm not sure how when Congress said we're not going to consider state and local records anymore, how a city of Pittsburgh website moves from a local record to a news media site. Right. Tell me your theory here. Can you perform an end run just by posting everything on the internet? I have a very simple theory on this, and I think it's right, Your Honor. The theory is this. We are required, the city's required, to publish this information. It is our job to make this information available to all citizens so that they can receive it and review it. They must have notice of what we're spending. We are required to publish this, and so by posting it on the internet, a method that is very familiar now to all Americans as a way of disseminating news, there can't be a more direct way for us to put that out than through the internet. And so you're right. Under Schindler-Elevator, there is a broad sweep, and in this environment where it is our obligation to provide notice, we believe it qualifies as news media. So is there a difference between the pre-act and post-act in terms of regional source and how that intersects with the news media? So the source issue is sort of a different issue, and I think from my view it reflects more an analysis not of what we publish, but who finds it. And here the history is really pretty interesting because what we have here are relators with counsel who went to the city, literally went to the city, and these are the ones we make available for the citizens to review and comment on. And based on this, they made what the district court referred to as quote-unquote studied extrapolations. And so the question that the district court analyzed from a jurisdictional perspective was, if you do nothing other than read those published, publicly available documents, do you qualify as an original source? And the court said no. In fact, the lion's share of the allegations in the complaint come directly from those published and public reports, and that does not qualify them as an original source. And for that reason, I would say they do not qualify in the jurisdictional analysis on the AFFH claim, and the ineligible expense claim was right on point. I mean, you know, this whole area of media is moving quickly. Yes. It's a serious point. What about instead of putting it on your website, what if you tweeted it? I know you only have 150 characters, but what if you tweeted it? Is that news to me? Where are we going with this? Beyond, so where I would hold my ground is in this very specific instance, Your Honor. And in this instance where we are required to provide notice and broadcast it widely for the purpose of notice, I think it qualifies as news media. If, for example, somebody were, some person were tweeting 142 characters at 5 a.m., does that qualify as news media? I don't have an answer to that. How about the City of Pittsburgh? The City of Pittsburgh may decide that, you know, some courts around the country. Right. Right. You know, look at, look at decision and X versus Y, interesting factual scenario. Good point of law. It's a great point of law. I'm not sure how it would fit with this circumstance because of the enormous volume of information we're required to make public. Yeah, okay, so it might be different, but all right. If I may, one final point. Sure. An argument's been raised both by the government and the relators about public policy, and I will simply suggest that here, where materiality is based now on a heightened standard, there's a balance there, a balance to be struck between giving notice to defendants, like the entitlement communities, and making sure this doesn't become a, the False Claims Act does not become a strict liability statute. There's a useful public policy to be served there, and that applies perfectly here. And again, with a public disclosure bar, the purpose here is to weed out opportunistic filers, like folks that go and read published and publicly available documents. Both public policy arguments in our favor will work towards affirmance of the district court's decision. Thank you, Your Honor. Judge Greenberg, any other questions? Do we hear from Amicus, or do you want to? I have reserved three minutes for rebuttal, Your Honor. I can wait till the end. Why don't we hear from Amicus, and you can rebut whatever you need to rebut. Okay, thank you. Is it Mr. Riley? Good afternoon, Nicholas Riley, United States, Amicus Superior Act. I'm here, sorry, I'm here to address the materiality issue, and I think it'd be helpful just to start with our position, the government's position, on this court's decision in Wilkins from 2011. I want to be very clear. The government's position is that much of Wilkins does remain good law. We are not asking this court to overturn Wilkins in its entirety. What we are asking is for the court to revisit that one portion of the Wilkins opinion that we think the district court relied on here, that we think has been displaced by Escobar, and that's this distinction between conditions of participation and conditions of payment. And specifically, it's the idea that a defendant's non-compliance with a condition of participation in a federal program cannot give rise to FCA liability. We think that Escobar is very clear that, in fact, conditions of participation in federal programs can give rise, can be material for the purposes of the FCA, and we think the relevant passage of Escobar on that point is at page, this is 136 of the Supreme Court Reporter at page 2002. This is the portion of the opinion where the Supreme Court is explaining why the defendant's position in that case, the defendant's approach, which was to say you can only find materiality when a condition has been expressly designated a condition of payment. Supreme Court's explaining why it's rejecting that view, and it says that under that approach you would exclude instances where a defendant misrepresents, and this is the quote, compliance with a condition of eligibility to even participate in a federal program. So we think it's very clear from the Supreme Court's opinion in Escobar that conditions of participation can, in fact, be material. And that's also just a logical position to have. I mean, if the idea that terminating a single payment is evidence of the government's, that the government finds a particular condition material, the notion that the government is not only going to terminate payment in a single instance, but prevent that recipient of, excuse me, that recipient of funds from receiving any funding at all in the future is in many ways an even harsher sanction. So we think that that could also still constitute clear evidence of materiality. So we would just say, again, we think Wilkins got a lot of things right. We think that this distinction between conditions of participation and conditions of payment is no longer good law in light of Escobar. All right, where does that leave us now, in this case, because the brief, which I thought was really outstanding, doesn't really take a position. What should we do with this case? Yeah, so I think that our recommendation is that this court should take a similar approach to what the Second Circuit did very recently in Bishop E. Wells Fargo, which is to vacate the district court's decision, vacate the order of dismissal, and remand with instructions to apply the new Escobar materiality standard in the first instance. Then you don't want us to take a position on whether or not there was a compliance with that standard. That's right. I think it would be on the record before the court currently, but that's exactly right. I think it would be useful for this court in remanding to provide some guidance on the standard. And specifically, I would just point to the factors that the district court considered here in drawing this conditions of participation, conditions of payment distinction. Many of those factors, we think, have no bearing on materiality. So for instance, one of the factors that the district court looked to, right, was the fact that we're dealing here with a highly complex regulatory regime, a number of requirements are imposed on the recipient of funds. We think that that by itself, that fact, the fact of complexity, the fact that we're dealing with a complex regulatory regime, does not by itself tell you anything about materiality. Materiality, as the Supreme Court in Escobar made clear, requires this more holistic analysis where you're looking to, from that, you know, panoply of different regulations and requirements, which of the ones, which of the requirements are most material, and are the violations alleged by the relator, are those specifically material? So the simple fact of complexity does not tell you very much. And Escobar makes that clear too, because the court in Escobar noted that it was dealing with a complex state Medicaid scheme, and that that was not a factor in the materiality analysis. In your brief, you didn't ask us to remand, did you? I don't know if we asked explicitly. I don't think you did. Yeah. You certainly gave us a simpler answer. Just a thought. But, okay. So you do think we should remand it? We do, yes. With, again, some of the guidance that we've identified here. In light of Wells Fargo? In light of Bishop? Well, we would think the remand would be in light of Escobar. We'd ask you to take an approach similar to what the Second Circuit... may be liable under a false certification here. As explained above. That's right. That's right, and that's what we're asking. We're saying that in remanding to the district court, this court should simply make clear that this distinction that Wilkins had previously drawn between conditions of participation and conditions of payment, that's no longer a valid distinction to draw as part of this materiality analysis. I understand that, but why can't we do that based on this record? Why can't this court apply that standard in the first instance? I mean, I guess there's no reason why the court couldn't. We think that the approach that the Second Circuit took in... That's all I was asking. Yeah, that's exactly right. I can see that my time is up, unless the court has further questions. Judge Greenberg? No, I... No, I'm not going to ask any more questions. All right, thank you very much. Thank you, Your Honor. I want to hit a few points in the three minutes that I have left. First, this court absolutely can rule on the materiality issue on the record that's before it. Those are legal questions. The standard is de novo. This court has full power to do that. Plus, it was a 12B1, 12B6 pre-answer dismissal. So this court has the same de novo standard to rule, to figure out whether the court erred or not. It should be reversed or not. Counsel, let me ask you something. What is the ultimate relief you're seeking in this action? Your Honor, we want the district court's decision to be reversed. I know that you want it reversed. But then what happens after the reversal? We want this court to explain to the district court and to all courts in this circuit how the materiality standard is to be evaluated post-Escobar. We want this court to find that the claims in this case are material under that standard. And to send it back to the district court for trial or for summary judgment. Now, suppose you win at that trial for summary judgment. What do you get? What happens? You mean the ultimate remedy if the plaintiffs prevail on the merits? Yes. The ultimate remedy is a refund of money that the court finds to have been taken or spent out of compliance with these core certifications. Your Honor, my client's interest is the deterrent factor. My client's interest in this suit is to deter the city from doing this in the future. From failing to disclose how it's going to spend gobs of money in any way that the public can make sense of and try to comment on and influence. But if the city has to cough up this sum of money, in a sense it may hurt your clients. I'm sorry, Your Honor, I couldn't hear your question. If the city has to come up with a lot of money and refund it to Washington, it may hurt your clients. Your Honor, those issues are not before the court at this time. The standard here is whether the relators have articulated a claim that is plausible. And the issues in determining that are whether the claims are material and the requirements of the law are material. And whether the defendants successfully invoked their affirmative defenses and proved their affirmative defenses of the public disclosure bar. We say, yes, the claims are material. No, the defendants did not meet their burden to prove the public disclosure bar defense. A few quick points in my remaining time. There are numerous statements made by the city's council today about facts that are not in the record. He said HUD has very close monitoring that it does. He said HUD was fully aware of the truth of the allegations in this case. He said the district court found there were studied extrapolations. What are the facts that were before the district court to make these findings? What facts were before the district court to justify the city's argument on this? There were none. It was to be evaluated on the face of the complaint. Secondly, the conditions of participation. The whole myriad complexity of the administrative screen. I want this court to look at that for what it is. That's a smoke screen argument here. You know, the issue is not whether it's a complex federal funding program. All federal funding programs are complex. All federal funding programs have a book of regulations that apply. All have an agency that administers the program. All of the agencies do monitoring. They do audits. They do testing. That argument leads to the conclusion that none of these federal programs are actionable under the False Claims Act, and that clearly is not what Congress intended. You know, here we have three, count them, three certifications that the city is required to make, that it does make, and that we say, my clients allege, it has done so falsely over years. You know, we're not talking about the panoply of complexity. We're talking about the three core things they have to promise that they will do before they get the money. The last thing I'll say, because I'm out of time and I could go on, is the city said HUD has no choice but to receive the money. We're an entitlement jurisdiction. That is absolutely false. The city submits an application to HUD for the funding every year. It's called the Annual Action Plan, the AAP. It's in that application where they make these promises that we have and we will. Affirmatively, further fair housing, as that is defined and as we've set forth. You know, do the citizen participation requirement. Not spend money on ineligible activities. If the city didn't make those certifications, they would not get the money. I mean, that goes to the core of the materiality inquiry. If they didn't make those certifications of compliance, if they didn't promise that they would comply with those requirements, HUD would not give them the money, period. You know, it goes to the core of materiality in this case. With that, Your Honor, I appreciate your time. Judge Greenberg, anything else? Nothing. Thank you. Thank you. Thank all counsel for your briefs and arguments. We're going to take a brief recess.